1

**COMPLAINT BY A PRISONER UNDER THE CIVIL RIGHTS ACT, 42 U.S.C §§ 1983**

2

3   Name OVERTON MICHAEL         LOUIS

4        (Last)          (First)          (Initial)

5   Prisoner Number C-47370

6   Institutional Address CALIFORNIA MEDICAL FACILITY

7   P.O. Box 2000 VACAVILLE CA.95696-2000

8

9

10        UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF CALIFORNIA

11   MICHAEL LOUIS OVERTON
     (Enter the full name of plaintiff in this action.)

12               vs.

13   Highland-Hospital/Emergency            Case No. _____
                                            (To be provided by the clerk of court)
14   Room Staff As of 6-2-1981
                                            **COMPLAINT UNDER THE**
15   DR. PHAN -Individual Capacity          **CIVIL RIGHTS ACT,**
                                            **42 U.S.C §§ 1983**  & A.D.A
16   DR. Rudas -Individual Capacity         USC§ 12201 To 12213
     (Enter the full name of the defendant(s) in this action)
17                                          504 REHABILITATION ACT.

18   *[All questions on this complaint form must be answered in order for your action to proceed.]*

19   I.    Exhaustion of Administrative Remedies

20        **[Note:** You must exhaust your administrative remedies before your claim can go

21        forward. The court will dismiss any unexhausted claims.]

22        A.    Place of present confinement C.A. MEDICAL FACILITY

23        B.    Is there a grievance procedure in this institution?

24                  YES (X)      NO ( )

25        C.    Did you present the facts in your complaint for review through the grievance

26              procedure?

27                  YES( )      NO (X)  PRIVATE ENTITY.- A.D.A.

28        D.    If your answer is YES, list the appeal number and the date and result of the appeal at

each level of review. If you did not pursue a certain level of appeal, explain why.

1. Informal appeal _____ *NOT APPLICABLE*

_____

_____

2. First formal level _____

_____

_____

3. Second formal level _____

_____

_____

4. Third formal level _____

_____

_____

E.   Is the last level to which you appealed the highest level of appeal available to you?

     YES ( )     NO (X)

F.   If you did not present your claim for review through the grievance procedure, explain

why. *THE CLAIM INVOLVES A COMMUNITY HOSPITAL*

_____

_____

## II.   Parties

A.   Write your name and your present address. Do the same for additional plaintiffs, if any.

*MICHAEL L. OVERTON CA. MEDICAL FACILITY*
*P.O. BOX 2000. VACAVILLE, CA 95696-2000*

_____

B.   Write the full name of each defendant, his or her official position, and his or her place of

employment.

*DR. PHAN EMERGENCY ROOM DOCTOR HIGHLAND-HOSP*
*DR. RUDAS 1ST YR RESIDENT-1981-E.R. HIGHLAND*
*HOSP.*

COMPLAINT                    - 2 -

III.    Statement of Claim

State here as briefly as possible the facts of your case. Be sure to describe how each defendant is involved and to include dates, when possible. Do not give any legal arguments or cite any cases or statutes. If you have more than one claim, each claim should be set forth in a separate numbered paragraph.

F A C T S.

PLAINTIFF STATES THAT IT IS A FACT THAT PLAINTIFF WAS CONVICTED OF 2nd DEGREE MURDER W/ USE TWICE, OF PLAINTIFFS WIFE, . IT IS ALSO A FACT THAT THE TREATMENT OF MRS - QVERTON WAS "FAR below" THE STANDARD OF CARE GENERALLY APPLIED To HOSPITALS. SEE EXHIBIT 1. To 6

PLAINTIFFS IN THIS CASE ~~EXHIBITED~~ STATES THAT THE DRS PHAN AND RUDAS EXPRESSED gross NEGLIGENCE AND MEDICAL MALPRACTICE IN TREATING MRS QVERTON.

IV.    Relief

Your complaint cannot go forward unless you request specific relief. State briefly exactly what you want the court to do for you. Make no legal arguments; cite no cases or statutes.

1. RECEIVE COMPENSATORY DAMAGES $20,000,000

2. PUNITIVE DAMAGES        25,000,000

COMPLAINT        - 3 -        45,000,000.⁰⁰

I declare under penalty of perjury that the foregoing is true and correct.

Signed this _16_ day of _June_, 20_08_

_Michael L. Curston_

**(Plaintiff's signature)**

**COMPLAINT** -4-

2ND TRIAL

PEOPLE V. M. OVERTON 73300

ORIGINAL

Appellant told Hahn that two weeks before the shooting Bobbie had thrown two beer bottles at his head. The police intervened, but appellant did not file charges against Bobbie. (RT 355.) In addition, appellant told Hahn that in October, 1980, right after appellant got out of jail, he went home and Bobbie assaulted him with a hammer. Appellant did not make a report of that incident, however, later dropped the charges. He and Bobbie separated in February of 1981. (RT 357.)

The Defense

Dr. John G. West testified that he is a physician, surgeon, and trauma care expert, who has served on a number of commissions charged with evaluating the quality of currently available trauma care, and with setting trauma care standards and guidelines for doctors and hospitals in the State of California. (RT 492-494.) He examined all the medical records maintained by Highland Hospital regarding the treatment of Barbara Overton. (RT 495.)

West testified that Overton received substandard medical care which was "far below" the standard of care generally applied to hospitals, such as Highland, which are community trauma care centers. (RT 496.) In his opinion, the hospital's failure to treat Overton was a direct cause of her death. (RT 511.)

The medical records indicate that Overton arrived at Highland at 7:46 p.m., 23 minutes after she was shot.

13.

EXHIBIT #1

(RT 497, 499.)  At that time her vital signs were taken, IV's
and a catheter were inserted and she began receiving blood.
She was also given an abdominal x-ray.  (RT 498.)  The
examination of Overton revealed that she had suffered a
low velocity gunshot wound, that she was in shock due to
the loss of blood, and that the blood loss was rapid.  (RT
499-500.)  West stated that these physical signs indicated
the bullet involved at least an artery and possibly a
femoral nerve.[6/]

   About one-half hour after her arrival at Highland
(8:10 p.m.), an abdominal tap was performed which indicated
Overton had blood in her abdomen.  (RT 500, 519.)  West
testified that this was an unequivocal sign that there was
a major problem (internal bleeding) and that the patient
had to be operated on immediately to control the bleeding.
(RT 502.)  He stated that the sole purpose of the abdominal
tap was to determine if such an operation was necessary,
and the result here indicated it was.  (RT 519.)

   West testified that when a person is bleeding,
there is a one hour period, known as the "golden hour" in
which a doctor can successfully stem the blood loss and
stabilize the patient.  Generally, after one hour, a bleeding

---

   6.  Pathologist Thomas W. Rogers testified that the
autopsy of the victim indicated she had been shot once in
the left thigh.  The bullet struck the femoral artery and
left femoral vein.  (RT 182-184.)  Overton died of shock
due to loss of blood.  (RT 189.)

14.

ExHibiT #2

patient will go into irreversible shock due to loss of blood if they remain untreated. (RT 503, 505.)

In this case, forty minutes after Overton's arrival, the treating physician, Dr. Phan, ordered a chest x-ray. (RT 499, 511.) Later, Phan ordered an arteriogram, a procedure wherein dye is injected into the artery so that a doctor can see exactly what is going on. (RT 502.) West testified that generally, it takes at least an hour to set up the necessary equipment and perform the arteriogram test. (RT 504.)

West stated that the arteriogram should never have been ordered in this case. It was medically unnecessary as the doctors already knew Overton was bleeding internally. (RT 503-504, 515.) Additionally, Overton had lost 23 minutes of the "golden hour," prior to her arrival at the hospital. Doing the arteriogram would use up the remaining minutes of the golden hour. (RT 503.)

Overton was sent into radiology for the arteriogram at 9:00 or 9:05. This was one hour and twenty-five minutes after she was shot. (RT 506.) At that time the doctor who was to perform the test was not even present; the hospital had to look for him. (RT 506-507.)

West testified that when Overton arrived in radiology, the radiologist noted she had a "thready" pulse. The radiologist became very upset and tried to reach Dr.

15.



Phan so Overton could be brought to the operating room immediately. (RT 506.) After two attempts Dr. Phan was located. (RT 513.) Overton was in cardiac arrest by the time Phan arrived. (RT 513.)

West testified that other than the treatment Overton received immediately when she arrived, she got no additional treatment and was basically left to bleed to death. (RT 515.) West stated that there was no excuse for the delay in this case. (RT 511.)

West testified that an operation, had it been performed, would have taken ten to fifteen minutes; perhaps even less time. (RT 520) He stated that the chance of survival, had the operation been performed, was 90 to 95 percent or better. West noted that the injury in this case was "fairly straightforward," the operation was simple, and that he could not remember the last time a hospital lost a patient like this. (RT 523.)

West had also spoken with a Dr. Rudas, the first-year resident who assisted in treating Overton. Rudas was extremely critical of the care she received and told West, in his own words, that "they had killed the patient." (RT 545.)

Rudas saw Overton when she first arrived and was involved in her initial treatment. He then left to treat another patient. He assumed, at that time, that Overton was on her way to the operating room. When Rudas returned, and

16.

Exhibit #4

learned Overton was in the arteriogram room, he got very
upset. He arrived in radiology about the time she went into
cardiac arrest. (RT 524.) Rudas performed external and
internal heart massage on Overton. Then he opened her
abdomen and tried to grab the aorta to stop the bleeding,
but things had gone too far. (RT 525.)

West stated that in his expert opinion this patient
should never have died. (RT 25.)

The settled record on appeal (MVJ:Exhibit C, p. 2)
indicates that on cross-examination West testified that the
treating physicians did not, in his opinion, intentionally
harm Overton, and that if Overton had not been shot she
would not have died. [7]

David DeGarmo testified [8] that he contacted Dr.
Robert Rudas at his home in Illinois, in his capacity as an
investigator for the Alameda County Public Defender. (MVJ:
Exhibit B, pp. 9-10.) Rudas told DeGarmo that when Overton
arrived at the hospital she was alert, oriented and

---

7. The majority of the cross-examination of West is
unavailable due to the loss of the reporter's notes. At the
hearing to settle the record, the court adopted the prosecu-
tion's summary of West's testimony on cross-examination as
constituting the settled record. (MVJ:Exhibit C, p. 1.)
Appellant would point out that this summary states that an
arteriogram was actually performed in this case. West's
testimony on direct examination, however, is unequivocal that
Overton was dead before the test could be done. (RT 506,
514.) It appears, therefore, the summary is incorrect.

8. The entirety of DeGarmo's testimony is also missing,
therefore the above statement is taken from the settled
record. (MVJ:Exhibit B, pp. 9-10; MVJ:Exhibit D, p. 3.)

17.



communicative. Rudas assisted Dr. Phan with initial treat-
ment of this patient and then left to see another patient,
telling Phan he would meet him in the operating room to
treat Overton. When Rudas went to the operating room,
neither Phan nor Overton were there. Rudas began "yelling
around" to find Phan, but was unable to find him. Then he
learned Overton was in radiology. When Rudas arrived in
radiology, the radiologist turned to him and asked what was
going on, as Overton had no pulse. Phan was not present.
Rudas attempted various life-saving techniques on Overton
but to no avail.

Rudas said that Highland was a general trauma
center and that if the emergency room had been properly
staffed and supervised Overton definitely would have survived.

/
/
/
/
/
/
/
/
/
/
/

18.

Exhibit #6





Michael L. Querton C-47273.70
CA Medical Facility
P.O. Box-2000
Vacaville, CA 95696-2000.

Legal-Mail

Clerk
United States District Court.
For The Northern District of CA.
P.O. Box 36060
450 Golden Gate Ave.
San Francisco, CA 94102-3489.

CA MEDICAL FACILITY
N-3-318
CA MEDICAL FACILITY
FIRST CLASS

$ 00.00
MAILED FROM ZIPCODE 95687
UNITED STATES POSTAGE
USA FIRST-CLASS FOREVER